******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JULIO RAMOS *v.* COMMISSIONER OF CORRECTION
(AC 37498)

DiPentima, C. J., and Beach and Sheldon, Js.*

*Argued December 2, 2016—officially released April 18, 2017*

(Appeal from Superior Court, judicial district of
Tolland, Sferrazza, J.)

*Mark M. Rembish*, assigned counsel, for the appellant (petitioner).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Gail P. Hardy*, state's attorney, and, on the brief, *Lisamaria T. Proscino*, special deputy assistant state's attorney, and *Vernon D. Oliver*, former assistant state's attorney, for the appellee (respondent).

*Opinion*

SHELDON, J. The petitioner, Julio Ramos, appeals, following the denial of his petition for certification to appeal, from the judgment of the habeas court dismissing his second amended petition for a writ of habeas corpus in this action. In that operative petition, the petitioner challenged, on the ground of ineffective assistance of counsel, the legality of his custody under judgments of conviction rendered against him in 1997, upon his negotiated pleas of guilty to three counts of robbery in the first degree in violation of General Statutes § 53a-134, one count of felony murder in violation of General Statutes § 53a-54c, and one count of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134. On appeal, the petitioner argues that the habeas court erred in rejecting, and later abused its discretion in denying, his petition for certification to appeal from the rejection of his three part claim that his challenged guilty pleas were not entered intelligently and voluntarily due to ineffective assistance of counsel. He asserts, more particularly, that his pleas were not entered intelligently or voluntarily because his trial counsel (1) failed to advise him of the affirmative defense of mental disease or defect, which he assertedly could have raised as to all of his pending charges under General Statutes § 53a-13, based upon a misinformed evaluation of his mental capacity at the time of the charged offenses by a forensic psychiatrist to whom she accidentally gave the medical records of a different inmate for the purpose of making that evaluation; (2) failed to conduct an adequate investigation as to the potential viability of the defense of lack of intent to commit robbery due to voluntary intoxication, which he also could have raised as to all pending charges under General Statutes § 53a-7, before advising him to plead guilty to those charges; and (3) advised him not to inform the trial judge that he had taken prescription drugs on the day of his guilty pleas and then failed to correct the record when, on the basis of her advice, he denied such drug use in response to the judge's questions during the plea proceeding. We dismiss the appeal.

The following factual and procedural history is relevant to our resolution of this appeal. On May 6, 1997, the petitioner pleaded guilty to five charges based on his admitted involvement in five similar incidents in June, 1996. In each such incident, the petitioner used force and violence against one or more employees of a commercial establishment in an effort to steal money to fund his addiction to and daily use of heroin[1] and "illy."[2] The charges to which he entered his guilty pleas, as previously noted, were: three counts of robbery in the first degree, in connection with separate incidents on June 2, 15, and 26, 1996; one count of felony murder, in connection with a later incident on June 27, 1996;

and one count of attempt to commit robbery in the first degree, in connection with a final incident on June 30, 1996. During the plea proceeding, the prosecutor set forth the following factual bases for the charges to which the petitioner was entering his pleas. On June 2, 15, and 26, 1996, the petitioner committed three armed robberies in a substantially similar manner. On each of those dates, the petitioner entered the convenience store of a Mobil gas station on Washington Street in Hartford, pretended to select items for purchase, then produced a handgun and demanded money from the cashier. In each such incident, the petitioner walked behind the counter of the store, pistol-whipped the clerk, then took money from the cash register before fleeing from the store on foot. Thereafter, on the night of June 27, 1996, the petitioner and his heroin dealer, Frederick Wright, agreed to rob Dan's Shell Station in West Hartford to obtain money to buy drugs. After Wright parked a borrowed car in a darkened area away from the store, the petitioner entered the store, walked behind the counter, and struck the cashier in the head with a pistol. During this assault, the petitioner shot and killed the cashier before taking money from the cash register and fleeing from the store on foot.[3] Three days later, on June 30, 1996, the petitioner entered another convenience store in Hartford and, once again pretended to select items for purchase, then walked behind the counter, produced a handgun and approached the clerk. At that point, however, the clerk attempted to grab the petitioner's gun and a struggle ensued. Although the petitioner struck the clerk several times in the head, the clerk surrendered no property to the petitioner, who eventually dropped his pistol and fled from the scene without taking anything. The petitioner was arrested within minutes of this attempted robbery. After being treated for injuries he sustained while he was being arrested, the petitioner returned to the Hartford police station, where he waived his *Miranda* rights[4] and admitted his involvement in each of the previously described incidents, including the June 27 robbery and shooting in West Hartford.

After he was arrested and gave his self-incriminating statement, the petitioner was presented in court, where he applied for the services of the public defender. Upon the granting of his application, Attorney Karen A. Goodrow was appointed to represent him. Over the course of the following year, Goodrow met with the petitioner several times to discuss his case. During one of those meetings, the petitioner informed Goodrow that he had used both heroin and "illy" every day in June, 1996, and that he had been under the influence of the two drugs during each of the previously described incidents. He further claimed that, because he had used heroin and "illy" on the night of June 27, 1996, he could not specifically remember robbing the store where the clerk had been shot and killed, or shooting the clerk. The peti-

tioner also informed Goodrow that sometime between the June 27 robbery and shooting and the June 30 attempted robbery that immediately preceded his arrest, he had smoked "illy" and attempted to commit suicide by placing a single round of ammunition into a revolver and pulling the trigger several times.

During the habeas trial, Goodrow testified that when she was first appointed to represent the petitioner, she was unfamiliar with the drug "illy," because the petitioner was the first client she had ever represented who claimed to have committed a crime while under the influence of that drug. Accordingly, after she learned of the petitioner's claim that he had continuously used a combination of heroin and "illy" throughout the month of June, 1996, Goodrow explored the viability of several possible defenses to the charged offenses based upon the petitioner's claimed use of that drug, in combination with heroin, at the time of his allegedly criminal conduct, including the affirmative defense of mental disease or defect under § 53a-13[5] and the defense of lack of intent to commit robbery by reason of voluntary intoxication under § 53a-7.[6]

To that end, Goodrow hired Dr. Peter Zeman, an experienced forensic psychiatrist, to conduct a psychiatric evaluation of the petitioner in order to assess the strength of those possible defenses and to determine "whether or not there was any mitigation evidence or evidence of intoxication." Prior to Zeman's evaluation, Goodrow received an authorization from the petitioner to obtain his medical records from the Department of Correction (DOC). The records she received pursuant to the authorization, however, belonged to a different inmate, who had the same first and last names as the petitioner but a different date of birth.[7] Failing to recognize that she had received medical records for the wrong Julio Ramos, Goodrow forwarded those records, along with the petitioner's own hospital records,[8] to Zeman for his review. Sometime after receiving such records, Zeman met with the petitioner and performed a twenty minute psychiatric evaluation of him.

On April 10, 1997, Goodrow met with Zeman to discuss his evaluation of the petitioner. During that meeting, Zeman informed Goodrow that he did not believe that the petitioner was psychotic at the time of the incidents here at issue, and thus that he did not believe that a defense of mental defect or disease was supported by the evidence. Zeman also informed Goodrow that, although he had little experience with the drug "illy," he did not believe that the petitioner's use of "illy" affected his state of consciousness to such a degree that he lacked the ability to form the intent required to commit robbery in any of the five incidents upon which the charges against him were based. In reliance upon Zeman's opinions, Goodrow abandoned her pursuit of both the affirmative defense of mental disease or defect

and the defense of lack of intent to commit robbery due to voluntary intoxication. Consequently, Goodrow did not ask Zeman to memorialize his opinions in a formal report.

Goodrow then entered into plea negotiations with the state. In light of the number and severity of the crimes with which he was charged, the petitioner faced a total exposure of over 140 years in prison if he were convicted on all charges. On April 15, 1997, Goodrow received an offer from the state, under which it would agree to cap the petitioner's sentence at a maximum of fifty years with the right to argue for a lesser sentence, if the petitioner would agree to plead guilty to three counts of robbery in the first degree, one count of felony murder, and one count of attempt to commit robbery in the first degree. On May 6, 1997, Goodrow presented the state's offer to the petitioner and advised him, in light of the apparent strength of the state's evidence and the lack of any viable defense based upon his voluntary intoxication, that he should accept it. That afternoon, the petitioner appeared before the court, *Schimelman*, *J.*, where, upon being canvassed, he pleaded guilty to the five charges in accordance with the state's offer. On July 11, 1997, the petitioner was sentenced by the trial court, *Espinosa*, *J.*, to fifty years in prison on the charge of felony murder, twenty years in prison on the charge of attempt to commit robbery in the first degree, and twenty years in prison on each of the three charges of robbery in the first degree. All of the petitioner's prison sentences were ordered to be served concurrently with one another, for a total effective sentence of fifty years. The petitioner did not appeal from his convictions.

On December 17, 2009, the petitioner commenced the present habeas corpus action on the ground that he had received ineffective assistance of counsel in connection with his guilty pleas, and thus that those pleas had not been entered intelligently and voluntarily. Specifically, the petitioner alleged that Goodrow had rendered ineffective assistance of counsel in connection with his guilty pleas because she: (1) failed to advise him of the affirmative defense of mental disease or defect, which he assertedly could have raised as to all of his pending charges under § 53a-13, based upon a misinformed evaluation of his mental capacity at the time of the charged offenses by a forensic psychiatrist to whom she accidentally gave the medical records of a different inmate for the purpose of making that evaluation; (2) failed to conduct an adequate investigation as to the potential viability of the defense of lack of intent to commit robbery due to voluntary intoxication, which he also could have raised as to all pending charges under § 53a-7, before advising him to plead guilty to those charges; and (3) advised him not to inform the trial judge that he had taken prescription drugs on the day of his guilty pleas and then failed to

correct the record when, on the basis of her advice, he denied such drug use in response to the judge's questions during the plea proceeding. The petitioner argued that, but for Goodrow's inadequate investigation into either the affirmative defense of mental disease or defect or the defense of lack of intent to commit robbery due to voluntary intoxication, and but for the fact that he was under the influence of prescription medication at the time he pleaded guilty, there is a reasonable probability that he would have pleaded not guilty and instead would have insisted on going to trial. In his prayer for relief, the petitioner requested that the court either vacate his guilty pleas so that he could proceed to trial or, in the alternative, vacate his sentence so he could be resentenced, pursuant to his plea bargain with the state, in light of the true psychiatric information about him, as set forth in his own DOC medical records.

Following the habeas trial, on November 17, 2014, the court, *Sferrazza, J.*, denied the petitioner's petition for a writ of habeas corpus. In its memorandum of decision, the habeas court did not distinguish between the affirmative defense of mental disease or defect and the defense of lack of intent to commit robbery due to voluntary intoxication. Instead, referring to them collectively as a "potential, voluntary intoxication defense," the court found that "Goodrow performed, in every respect, with the utmost professional care and sage advice on the topics of a potential, voluntary intoxication defense and all the information necessary for the petitioner to make voluntary and knowing guilty pleas. She had the petitioner examined by Dr. Zeman to discover whether the petitioner's extensive drug use, including the use of illy and heroin, provided a viable defense of voluntary intoxication. Goodrow quite correctly concluded that such drug usage by the petitioner was insufficient to establish such a defense. The petitioner presented no expert witness in the criminal defense field who criticized Goodrow's representation of the petitioner in any way, nor disputed her opinion and advice concerning the lack of a bona fide voluntary intoxication defense." (Internal quotation marks omitted.) With regard to the petitioner's claim that he was medicated at the time he entered his guilty pleas, the habeas court found that "[t]he credible evidence adduced at the habeas trial demonstrates that the petitioner possessed a state of mind at the time of his guilty pleas such that those pleas were entered intelligently, knowingly, and willingly. He now contends that he was under the influence of medication at the time he pleaded guilty; however, that testimony is contradicted by his responses during his plea canvass. The court disbelieves his testimony to the contrary."

On the basis of the foregoing findings, the habeas court determined that the petitioner had "failed to meet his burden of proving, by a preponderance of the evidence, that, but for the erroneous information in the

Department of Correction's mental records, he would have elected to have his fate determined by trial rather than through pleas of guilty." The court then denied the petitioner's operative petition for a writ of habeas corpus. Thereafter, on December 5, 2014, the court denied the petitioner's petition for certification to appeal from its judgment denying the habeas petition. This appeal followed. Additional facts and procedural history will be set forth as necessary.

Our standard of review on an appeal from the dismissal of a habeas corpus petition where the habeas court has denied the petitioner's petition for certification to appeal is well established. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, [the petitioner] must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits." (Internal quotation marks omitted.) *Melendez* v. *Commissioner of Correction*, 151 Conn. App. 351, 357–58, 95 A.3d 551, cert. denied, 314 Conn. 914, 100 A.3d 405 (2014). "A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Internal quotation marks omitted.) *Burgos-Torres* v. *Commissioner of Correction*, 142 Conn. App. 627, 630–31, 64 A.3d 1259, cert. denied, 309 Conn. 909, 68 A.3d 663 (2013); *Rosado* v. *Commissioner of Correction*, 129 Conn. App. 368, 371–72, 20 A.3d 85, cert. denied, 302 Conn. 916, 27 A.3d 368 (2011).

In his petition for certification to appeal, the petitioner sought permission to appeal from the dismissal of each part of his three part claim of ineffective assistance of counsel in connection with his challenged guilty pleas. Accordingly, we must "examine [each of] the petitioner's underlying claim[s] of ineffective assistance of counsel in order to determine whether the habeas court abused its discretion in denying [his] petition for certification to appeal.

"Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well set-

tled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Vazquez* v. *Commissioner of Correction*, 128 Conn. App. 425, 429, 17 A.3d 1089, cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011).

"A petitioner's right to the effective assistance of counsel is guaranteed by the sixth and fourteenth amendments to the United States constitution, and by article first, § 8, of the Connecticut constitution. . . . The right to counsel, however, is the right to effective assistance and not the right to perfect representation." (Internal quotation marks omitted.) *Lewis* v. *Commissioner of Correction*, 89 Conn. App. 850, 854–55, 877 A.2d 11, cert. denied, 275 Conn. 905, 882 A.2d 672 (2005). "In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense." (Internal quotation marks omitted.) *Vazquez* v. *Commissioner of Correction*, supra, 128 Conn. App. 430.

"To establish the first prong of the *Strickland* test, the petitioner must first establish that his attorney's performance was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law . . . ." (Internal quotation marks omitted.) *Lewis* v. *Commissioner of Correction*, supra, 89 Conn. App. 855. Where a petitioner has pleaded guilty, the second prong is governed by the United States Supreme Court's decision in *Hill* v. *Lockhart*, 474 U.S. 52, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985). "In order to establish prejudice in such cases, the petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." (Internal quotation marks omitted.) *Yerinides* v. *Commissioner of Correction*, 156 Conn. App. 71, 77, 111 A.3d 961 (2015); see also *Crawford* v. *Commissioner of Correction*, 285 Conn. 585, 598, 940 A.2d 789 (2008). "Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (Internal quotation marks omitted.) *Vazquez* v. *Commissioner of Correction*, supra, 128 Conn. App. 430.

With these principles in mind, we address the merits of each of the petitioner's claims of ineffective assis-

tance of counsel.

I

The petitioner's first claim of ineffective assistance in connection with his guilty pleas in this case is that those pleas were not entered intelligently or voluntarily due to erroneous advice from Goodrow that he had no viable affirmative defense of mental disease or defect in this case. That advice, he claims, was erroneous because it was based, in material part, upon the misinformed opinion of Dr. Zeman as to the petitioner's mental capacity at the time of the charged offenses, which opinion, in turn, was mistakenly based upon the examination of medical records for the wrong Julio Ramos, which Goodrow had given to him in error. The petitioner asserts that, had Goodrow provided the correct medical records to Zeman, or had he known that Zeman's evaluation was based on the wrong medical records, there is a reasonable probability that he would pleaded not guilty and instead would have insisted on going to trial. Although the petitioner has raised a colorable claim, debatable among jurists of reason, that his counsel rendered deficient performance in basing her advice to plead guilty upon the mental capacity evaluation by a psychiatrist to whom she gave the wrong medical records, we agree with the habeas court that the petitioner failed to establish that he was prejudiced by that alleged deficiency in this case. We thus conclude that the habeas court did not abuse its discretion in denying his petition for certification to appeal on that ground.

The following additional facts are necessary for our resolution of this aspect of the petitioner's ineffective assistance claim. At the habeas trial, Goodrow testified that during the initial stages of her investigation, she met with the petitioner several times and discussed his mental health issues, including his problems with depression, auditory hallucinations, and attempted suicide. She also recalled that, after one of those meetings, her investigator received an authorization from the petitioner to obtain a copy of his DOC medical records. Thereafter, she received medical records from the DOC, which were accompanied by a cover sheet bearing the petitioner's correct name, date of birth, and inmate number. Goodrow testified that she could not remember if she reviewed those medical records with the petitioner, but that had she done so, she would have noted that discussion in her files. She then provided those medical records to Zeman and asked him to assess whether the evidence in them could support an affirmative defense of mental disease or defect. Goodrow stated that, based upon Zeman's negative assessment, she did not feel that the petitioner could raise a viable affirmative defense of mental disease or defect at trial. Goodrow did not learn that she had obtained the wrong medical records from the DOC until the morning of her

testimony at the habeas trial.

Later in the habeas trial, the petitioner testified as to his mental health both in June, 1996, when the incidents underlying his guilty pleas were taking place, and from the date of his arrest, June 30, 1996, through the date of his guilty pleas, May 6, 1997. Specifically, he testified: that he had used heroin and "illy" on a daily basis in June, 1996; that he had smoked "illy" and attempted to commit suicide after he killed the victim in West Hartford; and that after his arrest, during the first year of his incarceration, he had been prescribed several antipsychotic medications to manage the depression and the auditory hallucinations he was then experiencing. With regard to his psychiatric evaluation by Zeman, the petitioner stated that he had informed Zeman of his substance abuse and mental health issues, but that Zeman had not taken any notes during their meeting. The petitioner also testified that Goodrow had never reviewed his medical records with him, explained to him the affirmative defense of mental disease or defect, told him why he was being evaluated by Zeman, or discussed with him Zeman's ultimate opinions regarding his case. Finally, the petitioner stated that he did not become aware that his counsel had given Zeman the wrong DOC medical records to examine in reaching his evaluation until after he was sentenced.

In addition to this testimony, the petitioner offered two sets of medical records into evidence. First, he offered the incorrect medical records that Goodrow had received from the DOC. Those records were offered to show that the other Julio Ramos had far fewer psychiatric issues and a much less severe drug history, than the petitioner. Second, the petitioner offered his own DOC medical records for the relevant time frame to demonstrate that, had Goodrow provided those records to Zeman for his review, his assessment of "the petitioner's true mental state would have been drastically different."

The petitioner's correct medical records documented the petitioner's first several months of incarceration, between July 1, 1996 and April 23, 1997. Several entries in those records supported the petitioner's claims that he had a history of suicide attempts and that he was experiencing auditory hallucinations and taking antipsychotic medications between July, 1996 and April, 1997. Additionally, a July 1, 1996 entry supported the petitioner's claim that he had attempted to commit suicide after killing the victim of the West Hartford robbery. At least one evaluator, however, opined that the petitioner was not psychotic, but rather that he suffered from post-traumatic stress disorder as a result of that killing. This opinion was consistent with several evaluations of the petitioner in his medical records that stated that the evaluators did not detect symptoms of overt psychosis in the petitioner's presentation. With these

additional facts in mind, we address the merits of the petitioner's first claim.

"A habeas petitioner can prevail on a constitutional claim of ineffective assistance of counsel [only if he can] establish both (1) deficient performance, and (2) actual prejudice." (Internal quotation marks omitted.) *Merle S.* v. *Commissioner of Correction*, 167 Conn. App. 585, 599, 143 A.3d 1183 (2016). "Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." (Internal quotation marks omitted.) *Hill* v. *Lockhart*, supra, 474 U.S. 56. If he can establish that his counsel's advice was objectively unreasonable, "[t]he [petitioner] must . . . [then] demonstrate that there was such an interrelationship between the ineffective assistance of counsel and the guilty plea that it can be said that the plea was not voluntary and intelligent because of the ineffective assistance." *Buckley* v. *Warden*, 177 Conn. 538, 543, 418 A.2d 913 (1979). The failure to make both necessary showings is fatal to a petitioner's claim that his guilty plea was entered involuntarily. "All of the circumstances surrounding the entry of the guilty plea in court should be considered in determining the voluntariness of the plea." *Williams* v. *Reincke*, 157 Conn. 143, 148, 249 A.2d 252 (1968). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Internal quotation marks omitted.) *Smith* v. *Commissioner of Correction*, 141 Conn. App. 626, 632, 62 A.3d 554, cert. denied, 308 Conn. 947, 67 A.3d 290 (2013).

Though we need not address the performance prong of this analysis, we observe at the outset that, on this record, the petitioner has raised a colorable claim, debatable among jurists of reason, on the issue of deficient performance. In this case, Goodrow interviewed the petitioner several times in a commendable attempt to learn as much as she could about her client's mental capacity at the time of the charged offenses, employed an investigator to work on his case, requested his medical records from the DOC, and retained an expert to assess the potential viability of the affirmative defense of mental disease or defect. In this respect, Goodrow's conduct was certainly thorough and professionally appropriate. By undertaking these efforts, however, she assumed an obligation to conduct her investigation in a constitutionally adequate manner, which required her to obtain and furnish accurate medical information to the expert with whom she consulted with so that the expert's opinion would be well-grounded and she could appropriately rely upon it in developing her case strategy and advising her client whether to go to trial. Due to a series of unfortunate events, however, Goodrow received medical records for someone other than her

client, but failed to review them with sufficient care and attention to discover the error. Those incorrect records were then transmitted to Zeman, so that he could review them before interviewing the petitioner and forming his opinions about his mental capacity at the time of the charged offenses. Regrettably, Goodrow was unaware of her mistake in transmitting the wrong medical records for Zeman's review until the morning of the habeas trial, long after her client had pleaded guilty.

As a result of Goodrow's mistake, Zeman's opinion as to the viability of the petitioner's potential affirmative defense of mental disease or defect was based, at least in part, upon erroneous information. By the same token, Goodrow's advice to the petitioner, which itself was based in material part upon Zeman's misinformed opinion, was also erroneous. Although the record makes it clear that this mistake was completely unintentional, we conclude that it is at least debatable among jurists of reason whether the making of such a mistake when reviewing critical medical records that purportedly belong to one's own client satisfies the minimum requirements of our state and federal constitutions as to the adequacy of trial counsel's performance.

Notwithstanding this conclusion, however, we agree with the habeas court that the petitioner failed to demonstrate that he was prejudiced by this aspect of Goodrow's performance in this case. Accordingly, we conclude that the habeas court did not abuse its discretion when it dismissed the petitioner's claim for relief on that ground, or later denied his petition for certification to appeal from the dismissal of that claim.

We are reminded that the petitioner's second amended petition stated two alternative prayers for relief. First, he requested that the court vacate his guilty pleas so that he might proceed to trial. Second, he requested that the court vacate his sentences so that he might be resentenced, pursuant to his plea agreement with the state, in light of the information contained in his DOC medical records. Each prayer for relief implicates a different standard for assessing prejudice, and thus we address each separately.

A

With regard to the petitioner's request that his guilty plea be vacated so that he might proceed to trial, we agree with the habeas court that the petitioner has failed to demonstrate a reasonable probability that, but for Goodrow's deficient performance, he would not have pleaded guilty and instead would have insisted on going to trial. *See Hill* v. *Lockhart,* supra, 474 U.S. 59. Accordingly, we conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal.

Where a petitioner who has pleaded guilty subsequently alleges that his guilty plea was the product of

ineffective assistance of counsel, "the petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." (Internal quotation marks omitted.) *Yerinides* v. *Commissioner of Correction*, supra, 156 Conn. App. 77. The United States Supreme Court has held that "where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the prejudice inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial . . . [and thus would have led counsel to change her recommendation as to the plea]. . . . [T]hese predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the idiosyncrasies of the particular decisionmaker." (Citations omitted; internal quotation marks omitted.) *Hill* v. *Lockhart*, supra, 474 U.S. 59–60; *Carraway* v. *Commissioner of Correction*, 144 Conn. App. 461, 472–73, 72 A.3d 426 (2013), appeal dismissed, 317 Conn. 594, 119 A.3d 1153 (2015). "Analysis of the strength of the state's case and the viability of unadvanced defense strategies informs this analysis, but it is not by itself determinative." *Carraway* v. *Commissioner of Correction*, supra, 476.

The petitioner claims that Goodrow never informed him about the potential availability of the affirmative defense of mental disease or defect and that, had she done so, there is a reasonable probability that he would have insisted on going to trial. In the alternative, he alleges that had he known that Zeman's opinion was based upon the wrong medical information, he would have insisted on going to trial "for everything to be correct." The petitioner was obligated to establish several necessary facts in order to demonstrate a reasonable probability that he would have insisted on going to trial had counsel properly advised him of the possible availability of the affirmative defense of mental disease or defect, based upon the proper advice from Zeman as to the viability of such defense. They included: first, that the affirmative defense of mental disease or defect was at least theoretically available to the petitioner based upon the facts of this case; second, that such affirmative defense was factually supported by at least some evidence available to the petitioner at trial; third, that the potential viability of that affirmative defense would have been established, in material part, by the contents of his DOC medical records and/or Zeman's likely testimony based upon them; fourth, that the potential viability of that affirmative defense, as supported by the petitioner's own medical records and Zeman's probable advice based upon it, would have been strong enough to require an attorney of ordinary skill and training in the criminal law to advise him of the potential costs and benefits of asserting that affirmative defense; and fifth, that had Goodrow

advised him of such potential costs and benefits, it is reasonably probable that he would have decided to go to trial. For the following reasons, we conclude that the petitioner failed to meet his burden of establishing prejudice.

First and foremost, the affirmative defense of mental disease or defect is legally unavailable on the facts of this case in light of the petitioner's own description of the conduct on which its assertion would have been based, to wit: his voluntary ingestion of heroin and "illy" in the month of June, 1996. Section 53a-13 (a), which generally defines that affirmative defense, provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." Section 53a-13 (b), however, limits the availability of that affirmative defense by providing in part: "It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof . . . ." In light of that express statutory limitation, we must conclude that the affirmative defense of mental disease or defect would not have been viable in this case as a matter of law.

Consistent with this logic, the record contains no evidence that the affirmative defense of mental disease or defect could have been raised at all, much less raised successfully, at trial. Any evidence of the petitioner's claimed voluntary drug use in the relevant time frame would have tended to defeat, rather than to support, that affirmative defense.

Furthermore, although it is true that the petitioner's own medical records, as they ultimately were produced and examined at trial, did suggest that he experienced hallucinations, had suicidal ideation, and was prescribed antipsychotic medications between July, 1996, and April, 1997, such evidence did not, without more, establish that he experienced any of these problems in June, 1996, or thus that he may have lacked substantial capacity to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law "*at the time he committed the proscribed act or acts* . . . ." (Emphasis added.) General Statutes § 53a-13 (a). Furthermore, the evaluations within these later records do not support the proposition that the petitioner suffered from psychosis in June, 1996. In fact, his assertion that this defense would have succeeded at trial is belied by several opinions within the medical records that the petitioner's decline in mental health was not indicative of a prolonged state of psychosis, but rather was a manifestation of the trauma and grief

that he suffered after he killed the victim of the West Hartford robbery. This opinion is further supported by the fact that the petitioner attempted to commit suicide *after* he killed the victim in this case. Thus, the habeas record contains insufficient evidence to support a finding that a defense of mental defect or disease likely would have succeeded at trial.

In addition to the lack of a viable affirmative defense, we are cognizant of the strength of the state's case and the risks associated with proceeding to trial. In this case, the petitioner was charged with a total of fifteen crimes in five separate informations. Had he elected to proceed to trial on the five charges to which he pleaded guilty alone, he would have faced a total exposure, if convicted, of 140 years in prison. He ultimately pleaded guilty to those five charges in exchange for a sentence capped at fifty years to serve, with the right to argue for a lesser sentence. Had the petitioner elected to proceed to trial, he faced a nearly insurmountable quantity of incriminating evidence. The state's evidence consisted of testimony from eyewitnesses as to each of the five robberies, physical descriptions of the perpetrator by such eyewitnesses that matched the petitioner in height, weight, and complexion, and voluntary confessions from both the petitioner and his codefendant, Wright, admitting their involvement in the June 27 robbery and felony murder. See part II of this opinion. Against the background of this highly inculpatory evidence, the petitioner's chances of being acquitted of these charges hinged entirely upon the likelihood of his success in raising either the affirmative defense of mental disease or defect or, in the alternative, a claim of lack of intent to commit a robbery by reason of voluntary intoxication. As discussed in the preceding paragraphs, however, the petitioner failed to put forth sufficient evidence to support a finding that the affirmative defense of mental defect or disease likely would have succeeded at trial. As further discussed in part II of this opinion, the events surrounding the five armed robberies seriously undermined the petitioner's defense of lack of intent to commit robbery by reason of voluntary intoxication.

It is well established that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome"; *Strickland* v. *Washington*, supra, 466 U.S. 694; and that the petitioner's burden of establishing such a probability "is not met by speculation . . . *but by demonstrable realities*." (Emphasis in original; internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, 127 Conn. App. 454, 458, 14 A.3d 1053, cert. denied, 302 Conn. 933, 28 A.3d 991 (2011). Considering the strength of the state's case; see *Carraway* v. *Commissioner of Correction*, supra, 144 Conn. App. 476; the low probability that an affirmative defense of mental defect or disease would have succeeded at trial; see id., 475; and the fact that the petitioner's overall

exposure was several times greater than the maximum sentence that the state agreed to under his plea deal; see *Yerinides* v. *Commissioner of Correction*, supra, 156 Conn. App. 75, 78; we conclude that the petitioner has failed to establish a reasonable probability that, but for Goodrow's mistaken transmission to Zeman of the wrong medical records and its consequences, he would have insisted on going to trial. Therefore, we agree with the habeas court that the petitioner failed to demonstrate that he was prejudiced by Goodrow's performance. See *Carraway* v. *Commissioner of Correction*, supra, 472–73. "Because the petitioner failed to establish that he was prejudiced by [counsel's] deficient performance, he cannot demonstrate that the issues pertaining to this claim are debatable among jurists of reason, that a court could resolve those issues differently or that the questions raised deserve encouragement to proceed further." *Sanders* v. *Commissioner of Correction*, 169 Conn. App. 813, 824, 153 A.3d 8 (2016). Accordingly, we conclude that the habeas court did not abuse its discretion in denying the petitioner's petition for certification to appeal with respect to his first ineffective assistance claim.

B

With regard to the petitioner's second prayer for relief, which was that the court vacate his guilty plea so that he could be resentenced, pursuant to the state's plea offer, in light of his correct medical information, we conclude that the petitioner has failed to present sufficient evidence to establish a reasonable probability that, but for counsel's alleged error, he would have received a lesser sentence. As such, we agree with the habeas court that the petitioner failed to demonstrate that he was prejudiced in this matter and conclude that the habeas court did not abuse its discretion in denying his petition for certification to appeal.

The following facts are necessary for our resolution of this claim. During the habeas trial, Goodrow testified that the state's plea offer "was a cap of fifty years with a right to argue for less . . . [and the judge] indicated not to be hopeful about . . . the securing of a lesser sentence." Goodrow further testified that on the morning of May 6, 1997, she informed the petitioner that "if he pled guilty, he must do so assuming that he will do, day for day, fifty years, and if he gets out in less it's a gift." When asked on cross-examination whether she thought that the state's offer was reasonable, Goodrow stated, "Well, good is relative. He could have faced a whole lot more time. Then, I have to say to him, as I did, if you're going to take this, you have to believe that you're getting day [for] day. You can't somewhere in your heart say, I'm going to take this plea bargain because I really know I'm only going to do forty-two years. . . . I thought forty years was reasonable, given everything."

In addition to the testimony at the habeas trial, the relevant transcripts reveal that the court, *Schimelman, J.*, informed the petitioner, "I want you to understand . . . that although your lawyer has a right to argue for a lesser sentence, there are no guarantees here, and the only way that you are going to be able to withdraw this [guilty plea] is that if the sentencing judge decides that you should be sentenced to more than fifty years as a total effective sentence, otherwise, you are going to be bound by this agreement and you are not going to be able to withdraw it; do you understand that?" The petitioner responded in the affirmative. The transcript generated in connection with the sentencing hearing reveals that the court, *Espinosa J.*, took judicial notice of Zeman's and Goodrow's concerns regarding the petitioner's decline in mental health following his arrest. Before the court sentenced the petitioner, Goodrow presented the following mitigating evidence: that over the course of his life, the petitioner had faced great adversity, including problems with drug addiction and mental health; that, other than the crimes to which he was about to plead guilty, he had a limited criminal record; that he had demonstrated the ability to secure and maintain employment until his heroin addiction spiraled out of control; that he was currently being treated for the trauma and grief he experienced after he took the life of another; and that, although these events resulted in the loss of an innocent life, the court's sentence should strive to achieve a balance between punishment and an opportunity for the petitioner to rehabilitate. With these additional facts in mind, we now address the petitioner's claim.

In a habeas proceeding, "[w]here the claimed difference in the result of the proceedings is a difference in sentence, a petitioner must show a reasonable probability that but for counsel's error, the sentence would have been lighter than the sentence actually imposed." (Internal quotation marks omitted.) *Crawley* v. *Commissioner of Correction*, 141 Conn. App. 660, 667, 62 A.3d 1138, cert. denied, 308 Conn. 946, 68 A.3d 656 (2013). This burden "is not met by speculation . . . *but by demonstrable realities*." (Emphasis in original; internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, supra, 127 Conn. App. 458.

In the present case, the petitioner failed to show what additional information Goodrow could have presented to the sentencing court or how such information likely would have resulted in a lesser sentence. At sentencing, Goodrow advanced the petitioner's drug addiction and mental health history as mitigating evidence on several occasions. Although the petitioner claims that Goodrow did not know the petitioner's true medical history at the time of sentencing, the petitioner failed to demonstrate how, if at all, his correct medical information would have differed from Goodrow's representations or how

such information would have resulted in a lesser sentence. See *Mejia* v. *Commissioner of Correction*, 48 Conn. App. 230, 233, 716 A.2d 894, cert. denied, 245 Conn. 902, 719 A.2d 1163 (1998). "Because this court is constrained to evaluating demonstrable realities, we will not engage in mere speculation." *Edwards* v. *Commissioner of Correction*, 87 Conn. App. 517, 526, 865 A.2d 1231 (2005).

Accordingly, the petitioner has failed to demonstrate that there is a reasonable probability that, but for counsel's errors, "the sentence would have been lighter than the sentence actually imposed." (Internal quotation marks omitted.) *Crawley* v. *Commissioner of Correction*, supra, 141 Conn. App. 667. Therefore, we agree with the habeas court that the petitioner failed to demonstrate that he was prejudiced in this matter. "Because the petitioner failed to establish that he was prejudiced by [counsel's] deficient performance, he cannot demonstrate that the issues pertaining to this claim are debatable among jurists of reason, that a court could resolve those issues differently or that the questions raised deserve encouragement to proceed further." *Sanders* v. *Commissioner of Correction*, supra, 169 Conn. App. 824.

## II

The petitioner's second claim of ineffective assistance in connection with his guilty pleas is that those pleas were not entered intelligently or voluntarily due to Goodrow's erroneous advice that he had no viable defense of lack of intent to commit robbery by reason of voluntary intoxication at the time of the charged offenses. The petitioner argues here, as he did on his first claim, that Goodrow was ineffective in giving the wrong medical records to Zeman to examine for the purpose of determining if they contained evidence that might support the defense of lack of intent to commit robbery due to involuntary intoxication. He also argues that she otherwise failed to take steps to inform herself as to the effects of smoking "illy," a drug with which neither she nor Zeman was previously familiar, on a person's capacity to form an intent. The petitioner argues that had Goodrow conducted an adequate investigation as to the intoxicating effects of "illy," taken alone or in combination with heroin, there is a reasonable probability that he would not have pleaded guilty and instead would have insisted on going to trial. Although the petitioner, as previously noted, has raised a colorable claim, debatable among jurists of reason, as to whether his counsel rendered deficient performance by transmitting the wrong medical records to the consulting psychiatrist, then basing her advice to the petitioner upon the psychiatrist's misinformed opinion; see part I of this opinion; we agree with the habeas court that the petitioner failed to establish that he was prejudiced by that alleged deficiency in this case. We

thus conclude that the habeas court did not abuse its discretion in denying his petition for certification to appeal from its judgment denying the habeas petition on that ground.

The following facts are necessary for our disposition of this claim. In the June 2, 1996 robbery of a Mobil gas station, the victim reported that the petitioner entered the store, pretended to purchase candy and, while the victim was in the process of making change, the petitioner produced a gun and demanded money. The victim also reported that when he responded slowly to these demands, the petitioner struck him several times in the head with the pistol, took money from the register, and fled from the scene.

In the June 15, 1996 robbery of the same Mobil gas station, the same victim reported that the petitioner entered the store, pointed a gun at him, and demanded a pack of cigarettes. The victim was then instructed not to move, at which time the petitioner walked behind the counter, struck the victim several times in the head with the pistol, and demanded that he open the register. At some point during the course of this robbery, a customer entered the store to pay for gasoline. The petitioner then represented that he was the cashier and, after he took the customer's money, he fled the scene.

The June 26, 1996 robbery occurred, yet again, at the same Mobil gas station. Moments after the petitioner entered the store, the cashier—who had twice before been the petitioner's victim—motioned to his friend that the petitioner was the man who had previously robbed him. This friend then exited the store and retrieved a second employee, who was outside assisting a customer. As the second employee entered the store, the petitioner pointed a gun at him and told him to turn around. After complying with the petitioner's order, the petitioner hit him several times in the head with the handgun. The petitioner then turned his gaze back upon the cashier and told him to "move back." The petitioner then demanded that the victim open the cash register. After opening the register, the petitioner demanded to know where the twenty dollar bills were located. When none could be found, the petitioner struck the victim in the head with the handgun. The petitioner then removed the money from the register, took several packs of cigarettes, and fled from the scene. When the police arrived, the second employee stated that he knew the petitioner by the street name, "Baby-J." After viewing two separate photographic arrays, the second employee positively identified the petitioner as the man who had robbed the store.

The events of the June 27, 1996 felony murder are summarized as follows. In his voluntary statement to the police, the petitioner confessed that he had planned the robbery with his codefendant, Wright. The petitioner stated that prior to the robbery, he and Wright

had agreed that the petitioner would rob a convenience store, Wright would be the getaway driver, and they would split the proceeds afterward. On the night of June 27, 1996, the petitioner claims that he smoked two blunts containing heroin and "illy," which "made him crazy." At approximately 11 p.m., the petitioner entered Dan's Shell Station armed with a handgun. Before the petitioner could rob the store, however, another customer entered the store to purchase a gallon of milk. This witness recalled that as he approached the store, the petitioner was near the register, but that as soon as he entered the store, the petitioner walked away from the register and proceeded down another aisle. The witness then purchased a gallon of milk and exited the store. After the witness left the store, the petitioner reapproached the register, pointed a handgun at the victim, and demanded money. The same witness recalled that as he looked back into the store from the parking lot, he observed the petitioner holding the victim down with his left hand, while hitting him with the gun in his right hand. The petitioner claimed that during his struggle with the cashier, his gun accidentally discharged, killing the victim. After he shot the victim, the petitioner walked behind the counter and proceeded to take money from the register.

Moments after the petitioner shot the victim, a second witness, who had not heard the gunshot, approached the store from the side opposite where the first witness had come from. This second witness testified that as he reached the door, he observed the petitioner walk out from behind the counter, stumble over the victim's body, and drop some money on the ground. The petitioner then stopped and calmly picked the fallen money off of the ground before exiting the store in the direction of the first witness. After realizing what had just occurred, the second witness returned to his truck so that he could continue to observe the petitioner. He then observed the petitioner walk calmly across the parking lot, down Flatbush Avenue, and enter the passenger seat of a car with its lights turned off, which was parked behind some bushes "like it didn't want to be noticed . . . ."

In addition to these facts, both Goodrow and the petitioner testified about the petitioner's use of heroin and "illy" during the habeas trial. On direct examination, Goodrow acknowledged that the petitioner was the first client that she had ever represented who claimed to have committed a crime while under the influence of "illy." She also stated that she typically relied on experts to educate her as to the effects of various narcotics on persons ingesting them. As such, she asked Zeman to assess whether the petitioner's use of "illy" might support a claim of lack of intent due to voluntary intoxication. After his evaluation, Zeman informed Goodrow that, although he was unfamiliar with the effects of "illy," he did not believe that the petitioner's drug use

during the incidents from which his charges arose would have supported a claim that he was unable to form a criminal intent due to voluntary intoxication. Despite Zeman's unfamiliarity with the drug, Goodrow stated that she did not conduct an independent investigation into the effects of "illy." Lastly, Goodrow testified that she relied upon Zeman's opinion when she abandoned this defense strategy and advised the petitioner to plead guilty.

On direct examination, the petitioner testified that he used several drugs on a daily basis during the month of June, 1996, including heroin, crack cocaine, "illy," and "wet."[9] The petitioner claimed that he used heroin and "illy" "every day . . . pretty much all day . . . ." He further claimed that, in addition to his daily use of twelve to fifteen packets of heroin, he purchased between eight and ten "pieces" of "illy" each day, at a price of twenty dollars apiece.[10] The petitioner stated that, when he smoked "illy," he felt "[t]otally different . . . like [he] . . . [he] could do whatever, though, you know, like, strong, angry . . . ." The petitioner further stated that the effects of "illy" became stronger when he mixed it with heroin. Lastly, the petitioner stated that had he not been under the influence of "illy," he never would have been capable of committing these crimes. With these additional facts in mind, we turn now to the merits of the petitioner's second claim of ineffective assistance of counsel.

The petitioner argues that he received ineffective assistance of counsel because Goodrow: (1) provided incorrect medical information to Zeman, thereby discrediting the petitioner's statements regarding his drug use during his psychiatric evaluation; (2) accepted and relied upon Zeman's opinion that the petitioner's drug use did not support a claim of voluntary intoxication, despite the fact that Zeman admittedly had little experience with "illy"; and (3) failed to further investigate the intoxicating effects of "illy," despite the fact that neither she nor Zeman were familiar with the drug. The petitioner further claims that, as a result of her inadequate investigation, Goodrow was unprepared to handle critical junctures in the petitioner's case, including: effectively analyzing the strength of the state's case, obtaining the most favorable plea offer for the petitioner, assessing the reasonableness of the state's plea offer, and advising the petitioner whether to proceed to trial. The petitioner claims that, had Goodrow conducted an adequate investigation into the effects of "illy," there is a reasonable probability that he would not have pleaded guilty and instead would have insisted on going to trial.

The respondent, the Commissioner of Correction, disagrees, and asserts that the petitioner failed to establish how he was prejudiced in this case because: (1) Goodrow possessed independent knowledge of the petition-

er's drug use, and thus she did not rely exclusively upon Zeman's opinion when she determined that the facts did not support a claim of lack of intent due to voluntary intoxication; (2) the petitioner failed to elicit testimony or produce evidence that Zeman discredited the petitioner's statements during the psychiatric evaluation; (3) based upon the number and severity of the crimes with which the petitioner was charged, it was highly unlikely that the petitioner would have insisted on going to trial; and (4) the habeas court discredited the petitioner's testimony that he would have insisted on going to trial. We agree with several of the respondent's arguments, and thus we agree with the habeas court that the petitioner failed to demonstrate that he was prejudiced by this aspect of counsel's allegedly deficient performance. Accordingly, we conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal.

"[W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error prejudiced the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change [her] recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." (Internal quotation marks omitted.) *Hill* v. *Lockhart*, supra, 474 U.S. 59; *Carraway* v. *Commissioner of Correction*, supra, 144 Conn. App. 472. "[A] petitioner's assertion after he has accepted a plea that he would have insisted on going to trial suffers from obvious credibility problems and must be evaluated in light of the circumstances the defendant would have faced at the time of his decision." (Internal quotation marks omitted.) *Carraway* v. *Commissioner of Correction*, supra, 475. Therefore, "the likelihood of an acquittal or a shorter sentence is a factor to be considered in assessing whether an attorney who had found different evidence or considered advancing . . . [a theory of] defense would have advised [her] client to reject a plea offer and go to trial. Likewise, the credibility of the petitioner's after the fact insistence that he would have gone to trial should be assessed in light of the likely risks that pursuing that course would have entailed." Id., 475–76. "The burden to demonstrate what benefit additional investigation would have revealed is on the petitioner." (Internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, supra, 127 Conn. App. 459. This burden "is not met by speculation . . . *but by demonstrable realities*." (Emphasis in original; internal quotation marks omitted.) Id., 458.

As a preliminary matter, we note that the petitioner's claim is stated broadly and reasonably could be interpreted as alleging an individual claim of ineffective assistance of counsel as to each of his five guilty pleas.

We decline to assess each individual guilty plea, however, because each of his guilty pleas involved the same type of criminal conduct and implicated the same theory of defense. Thus, although our review of the substantive law is limited to the charge of felony murder, the rationale underlying our conclusion applies with equal force to the four remaining charges to which the petitioner pleaded guilty in this case. We now address the substantive law that the petitioner would have faced had he proceeded to trial on the charge of felony murder.

The crime of felony murder is codified in § 53a-54c.[11] "In order to obtain a conviction for felony murder the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony, and in addition, that a death was caused in the course of and in furtherance of that felony. . . . There is no requirement that the state prove an intent to cause death." (Citation omitted.) *State* v. *Castro*, 196 Conn. 421, 428–29, 493 A.2d 223 (1985). In this case, the applicable underlying felony was robbery. See General Statutes § 53a-133. Robbery "consists of larceny committed by the use or threat of the use of force, with the specific intent to deprive another of property." *State* v. *Dwyer*, 59 Conn. App. 207, 218 n.16, 757 A.2d 597, cert. denied, 254 Conn. 937, 761 A.2d 763 (2000); see General Statutes §§ 53a-134, 53a-133, 53a-119. Thus, had the petitioner elected to go to trial, the state would have assumed the burden of proving, beyond a reasonable doubt, that he had the intent to deprive another of his property by the use of force or threat of force at the time the alleged robbery occurred; see *State* v. *Dwyer*, supra, 218 n.16; and that a death was caused in the course of and in furtherance of that felony. See *State* v. *Castro*, supra, 428–29.

Because "the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony"; (internal quotation marks omitted) *State* v. *Deleon*, 230 Conn. 351, 362, 645 A.2d 518 (1994); defense counsel may introduce evidence of intoxication, pursuant to § 53a-7, as evidence negating the petitioner's intent to commit the designated underlying felony. A successful claim of voluntary intoxication, however, requires proof that the level of intoxication was so severe that it "affected the operation of the mind of the accused and made him incapable for the time being of forming a rational intent or of controlling his will . . . ." *State* v. *Stevenson*, 198 Conn. 560, 570, 504 A.2d 1029 (1986). If a defendant puts forth evidence that he was intoxicated at the time the alleged crime occurred, "the burden remain[s] with the state to persuade the jury beyond a reasonable doubt that the defendant, in spite of any intoxication, had the capacity to, and did, form the [specific] intent" to commit the crime. (Internal quotation marks omitted.) Id., 569. Thus, had the petitioner proceeded to trial, his trial counsel may have offered evidence of intoxication to

establish either that he lacked the ability to form the intent to commit larceny or that, while acting with an intoxicated mental state, his intent to take the property of another did not amount to larceny, and thus that he could not be convicted of robbery. See General Statutes § 53a-7; see, e.g., *State* v. *Smith*, 317 Conn. 338, 348–56, 118 A.3d 49 (2015) (holding that one cannot be convicted of attempt to commit robbery if he believes that he owns the property he is accused of attempting to take from another).

With these legal principles in mind, we conclude that the petitioner has failed to present sufficient evidence to support a finding that the defense of voluntary intoxication likely would have succeeded at trial, and thus that he has failed to demonstrate that, had Goodrow further investigated the effects of "illy," she would have changed her recommendation as to the plea. See *Hill* v. *Lockhart*, supra, 474 U.S. 59. Our conclusion rests upon several inadequacies in the record before the habeas court, including, inter alia, the absence of evidence or testimony regarding: (1) the psychological effects of smoking "illy";[12] (2) a more definite measure of how much "illy" the petitioner ingested on the nights in question;[13] (3) how smoking "illy" reduces a person's ability to form intent; (4) whether Zeman actually discredited any of the petitioner's statements regarding his drug use based upon the contents of the incorrect medical records he examined; (5) how Zeman's unfamiliarity with "illy" resulted in an erroneous opinion, namely, that the facts of this case did not support a viable claim of voluntary intoxication; or (6) whether a different psychiatrist might have reached a more favorable conclusion, based upon the facts of this case. In the absence of such evidence, we are left to speculate as to whether the defense of lack of intent due to voluntary intoxication likely would have succeeded at trial, or thus whether Goodrow would have changed her recommendation as to the plea had she further investigated the drug's effects. "Because this court is constrained to evaluating demonstrable realities, we will not engage in mere speculation." *Edwards* v. *Commissioner of Correction*, supra, 87 Conn. App. 526.

Contrary to the petitioner's assertion, we note that the factual record actually supports a finding that, both prior to and during the commission of each of these robberies or attempted robberies, the petitioner acted with the intent required for the commission of a robbery, to wit: the conscious objective of depriving an owner of his property by the use of force. For example, the facts surrounding the first incident support a finding that the petitioner maintained sufficient control over his faculties to feign making a purchase, and to wait until the cashier was in the process of making change before displaying his handgun and attacking him for the obvious purpose of stealing money from him by the use of force. The facts surrounding the second incident

similarly support a finding that, when his effort to steal from the clerk was interrupted by a customer, the petitioner had the ability to think on his feet and pretend that he was the cashier in order to conceal his crime and prevent his apprehension. In the third incident, the petitioner managed to control two employees simultaneously for the purpose of consummating a robbery, as confirmed by his demand after beating both of them to know where twenty dollar bills were located. We are reminded, in so noting, that the petitioner testified at the habeas trial that he routinely purchased pieces of "illy" for twenty dollars apiece.

The record before the habeas court also supports a finding that the petitioner was capable of forming the intent to commit robbery on the night of June 27, 1996, when he shot and killed the cashier at Dan's Shell Station in West Hartford. First, the petitioner admitted that he conspired with Wright to rob a convenience store on that evening and to split the proceeds afterward. These facts support a finding that the petitioner pre-planned the robbery before he entered the store, and acted with the conscious objective of depriving an owner of his property by the use or threatened use of force. Second, while the petitioner was inside the store, but before he displayed his handgun, another customer entered the store. At that point, the petitioner retreated to another aisle and waited until the customer had completed his purchase and left the store. It was only after the witness had exited the store that the petitioner resumed the robbery. These facts support a finding that the petitioner was aware of the consequences of robbing the cashier in front of an eyewitness, and thus that he made a conscious decision to postpone his robbery until the witness had left the store. Finally, after the petitioner left the store, he proceeded to the exact location where Wright had parked the car, despite the fact that this robbery occurred at night, that the car was parked away from the immediate vicinity of the store, and that the car was parked behind bushes with its headlights turned off. These facts support a finding that the petitioner was conscious of his surroundings and of the nature of his conduct at the time of his actions, that he was able to recall where Wright would be waiting for him and how to get there, and further, that he knew how to disguise his criminal act by calmly walking away from the crime scene. The totality of these facts support a finding that the petitioner had ample control of his faculties on the night of June 27, 1996, thereby undermining, if not completely disproving, his claim of lack of intent due to voluntary intoxication.

Of greatest significance, however, is that the petitioner has failed to establish, beyond mere speculation, "what benefit additional investigation would have revealed . . . ." (Internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, supra, 127

Conn. App. 459. The petitioner presented no evidence as to how his use of "illy" could have supported a defense of lack of intent to commit robbery, how "evidence [of illy's intoxicating effects] likely would have changed the outcome of a trial"; *Hill* v. *Lockhart*, supra, 474 U.S. 59; or how further investigation as to such effects would have informed Goodrow's judgment or altered her recommendation as to the costs and benefits of pleading guilty, a necessary predicate to establishing that he was prejudiced in this case. See id.; see also *Carraway* v. *Commissioner of Correction*, supra, 144 Conn. App. 472–73. As a result, we agree with the habeas court that the petitioner failed to demonstrate that he was prejudiced by this aspect of Goodrow's performance. "Because the petitioner failed to establish that he was prejudiced by [counsel's] deficient performance, he cannot demonstrate that the issues pertaining to this claim are debatable among jurists of reason, that a court could resolve those issues differently or that the questions raised deserve encouragement to proceed further." *Sanders* v. *Commissioner of Correction*, supra, 169 Conn. App. 824. Accordingly, we conclude that the habeas court did not abuse its discretion in denying his petition for certification to appeal as to his second claim of ineffective assistance of counsel.

### III

The petitioner's third and final claim of ineffective assistance in connection with his guilty pleas is based upon his allegation that, at the time he entered those pleas, Goodrow knew but failed to apprise the court that he was under the influence of prescription drugs. On the further basis of that allegation, he argues that, as a result of being under the influence of prescription drugs at the time of his pleas, he did not enter his pleas voluntarily.[14] We disagree.

The following additional facts are necessary for our resolution of this claim. The petitioner's DOC medical records reveal that he was prescribed several different medications while he was incarcerated in 1996 and 1997. These medications included Mellaril, Haldol, and Risperdal. The records also reveal that the petitioner's medications and dosages fluctuated throughout April, 1997. The records, however, concern a time frame that ended on April 23, 1997, approximately two weeks before the date of the petitioner's guilty pleas, on May 6, 1997. Apart from those records, there was no evidence before the habeas court regarding the medication the petitioner claims to have taken before he pleaded guilty.

The petitioner testified before the habeas court that, on the date of his guilty pleas, he informed Goodrow that he had taken prescription medication, but that she instructed him to lie about it to the court. Specifically, he claimed that she instructed him not to upset the judge, and thus that if he were asked whether he had taken any medication that day, he should say that he

had not. Contrary to the petitioner's claims, Goodrow testified that, before the petitioner pleaded guilty, she met with the petitioner and reviewed the plea canvass procedure with him. On the basis of that meeting, she had no concerns that the petitioner was unable to understand the nature of the proceedings against him. If she had had such concerns, she further testified, she would have notified the court. Later that afternoon, the petitioner entered five guilty pleas after being canvassed by the court, *Schimelman, J.*[15]

The petitioner's sentencing occurred two months later, on July 11, 1997. At the sentencing hearing, the trial court, *Espinosa, J.*, afforded the petitioner an opportunity for allocution, at which time he made a brief statement expressing his remorse for the murder victim's death.[16] Before the court announced its sentence, Goodrow confirmed that the petitioner was deeply remorseful for the victim's death, and informed the court that he was then taking prescribed psychotropic medication to help him cope with the trauma of having taken the life of another person. The sentencing court did not inquire of the petitioner on that subject, and neither Goodrow nor the petitioner offered details as to what medication he was then taking, what was the dosage of such medication, how recently he had taken such medication prior to sentencing, or how, if at all, such medication affected his ability to comprehend what was happening in court.

On the basis of the foregoing evidence, the habeas court found that "the petitioner possessed a state of mind at the time of his guilty pleas such that those pleas were entered intelligently, knowingly, and willingly. . . . The court disbelieves his testimony to the contrary. . . . At [the sentencing] hearing, the petitioner never expressed a desire to withdraw his guilty pleas. Instead, the petitioner cogently conveyed his apology to the family of the deceased and his wish that he could undo the harm he caused. Goodrow then noted for the sentencing court that the petitioner was then taking antipsychotic medications, in order to maintain his mental health, but no identification of the medication was mentioned, nor whether the medication reduced the petitioner's ability to comprehend the proceedings in which he had participated." After issuing its memorandum of decision, the court denied the petitioner's petition for certification to appeal.

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by this court for

determining the propriety of the habeas court's denial of the petition for certification. Absent such a showing by the petitioner, the judgment of the habeas court must be affirmed." *Taylor* v. *Commissioner of Correction*, 284 Conn. 433, 449, 936 A.2d 611 (2007).

Where a petitioner claims that he was under the influence of medication at the time he pleaded guilty, he bears the burden of "demonstrating that [his] mental condition was so impaired, by medication or otherwise, that he did not understand the ramifications of his actions when he entered his plea of guilty." Id., 454. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Thus, [t]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Citation omitted; internal quotation marks omitted.) Id., 448.

In the present case, the record lacks any credible evidence to support a finding that the petitioner was under the influence of prescription drugs at the time he entered his guilty pleas. The only evidence offered by the petitioner was his uncorroborated testimony that he took medication on that day and that Goodrow instructed him to lie about it. The habeas court expressly discredited that testimony. "The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) *Joseph* v. *Commissioner of Correction*, 117 Conn. App. 431, 433, 979 A.2d 568, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009). We will not disturb the habeas court's finding as it relates to the petitioner's credibility.

Even if the petitioner did take prescription medication on the day of his pleas, moreover, he failed to establish what medication he had taken, its dosage, when it was taken in relation to when he pleaded guilty, or what effect, if any, it had on his cognitive abilities. We further note that the petitioner was canvassed by the court, which asked him several questions about his mental state, including whether he had taken any medication that would affect his ability to understand the nature of the proceedings against him. The petitioner continuously stated that he was not under the influence of drugs, alcohol, or medication. The court even went so far as to inquire about a bruise under the petitioner's eye to determine if that injury might be affecting his ability to understand the proceedings. The petitioner answered in the negative. "It is well established that [a] trial court may properly rely on . . . the

responses of the [defendant] at the time [he] responded to the trial court's plea canvass . . . ." (Internal quotation marks omitted.) *State* v. *Stith*, 108 Conn. App. 126, 131, 946 A.2d 1274, cert. denied, 289 Conn. 905, 957 A.2d 874 (2008). There is no evidence in the record to support the petitioner's claim that he lacked an understanding as to the nature of the proceedings or the consequences of his guilty pleas.

"On the basis of this evidence, the habeas court reasonably concluded that the petitioner had failed to establish that his guilty plea was not the product of a knowing, voluntary and intelligent decision. In particular, the habeas court reasonably found that the petitioner had failed to adduce evidence sufficient to sustain his burden of demonstrating that the petitioner's mental condition was so impaired, by medication or otherwise, that he did not understand the ramifications of his actions when he entered his plea of guilty." *Taylor* v. *Commissioner of Correction*, supra, 284 Conn. 454. After "giving appropriate deference to the court's factual findings, we conclude that the habeas court properly found that the petitioner's plea was knowingly and voluntarily given." *Carey* v. *Commissioner of Correction*, 86 Conn. App. 180, 185–86, 860 A.2d 776 (2004), cert. denied, 272 Conn. 915, 866 A.2d 1283 (2005). "Accordingly, we conclude that the petitioner has failed to show that this claim involves issues that are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further. Thus, the habeas court did not abuse its discretion when it denied the petition for certification to appeal this claim." *Merle S.* v. *Commissioner of Correction*, supra, 167 Conn. App. 600.

The appeal is dismissed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The petitioner claims that in June, 1996, he ingested approximately fifteen bags of heroin intranasally each day.

[2] At the conclusion of the habeas trial, the court, *Sferrazza, J.*, sustained the objection by the respondent, the Commissioner of Correction, and excluded from evidence a Department of Public Health fact sheet on "illy" because the petitioner failed to establish that the public defender's office routinely relied upon such publications, and thus the evidence was deemed not relevant to the issue of whether trial counsel's performance was constitutionally deficient. See part II of this opinion. The petitioner's habeas counsel failed to submit any additional medical or scientific evidence regarding either the chemical composition of "illy" or the effects of smoking the drug.

For purposes of this appeal, we take judicial notice that "[i]lly is the street name for a drug consisting of a nonuniform mixture of phencyclidine (PCP), wood alcohol, methanol and formaldehyde," which is then smoked by the user. *State* v. *Billie*, 47 Conn. App. 678, 680 n.2, 707 A.2d 324 (1998), aff'd, 250 Conn. 172, 738 A.2d 586 (1999); see also S. Chlebowski & C. Leonard, "The Forensic and Legal Implications of Water, Wet, or Fry," 40 J. Am. Acad. Psychiatry L. 270, 271 (2012) (noting that, in Connecticut, "illy" commonly refers to dried marijuana that previously has been soaked in formaldehyde).

[3] During the prosecutor's recitation of the facts, it was alleged that a witness observed the petitioner beat the cashier, and thereafter place the gun to the back of his head and fire a single shot. The petitioner maintains,

however, that the gun discharged accidentally during his struggle with the victim.

[4] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

[6] General Statutes § 53a-7 provides in relevant part: "Intoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged . . . ."

[7] The incorrect medical records were accompanied by a cover sheet, which stated the petitioner's correct name, inmate number, and birth date. The records themselves, however, contained a different inmate number and a date of birth that differed by approximately ten years.

[8] The Saint Francis Hospital and Medical Center records, which were generated in connection with the petitioner's arrest on June 30, 1996, were not offered as evidence in the habeas trial. We are therefore unable to determine what impact these records had on either Goodrow or Zeman's evaluation as to the petitioner's mental state.

[9] The petitioner did not testify that he used crack cocaine or "wet," in combination with heroin and "illy," prior to committing these crimes. Furthermore, the issues raised on appeal are limited, in that the petitioner alleges that Goodrow's investigation into the claim of voluntary intoxication was deficient only as it relates to her investigation into the petitioner's use of heroin and "illy." We thus decline to address what additional effects, if any, the use of crack cocaine or "wet" would have had on the petitioner's ability to form the intent to commit robbery in June, 1996.

[10] The petitioner failed to further elaborate how much "illy" was contained in each "piece." Thus, the habeas record lacks sufficient evidence to determine the actual amount of "illy" that the petitioner claims he ingested on the days in question.

[11] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, such person commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, such person, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[12] See footnote 3 of this opinion.

[13] See footnote 10 of this opinion.

[14] Although a petitioner's claim that his guilty plea was involuntary due to his medicated state must ordinarily "be raised either on direct appeal or by way of a motion to withdraw the plea in order to avoid procedural default"; *Merle S.* v. *Commissioner of Correction*, supra, 167 Conn. App. 594; the respondent, in this case, failed to allege either an abuse of the writ or a procedurally defaulted claim in his return. See, e.g., *Mejia* v. *Commissioner of Correction*, 98 Conn. App. 180, 195–96, 908 A.2d 581 (2006); see also Practice Book § 23-30 (b). Accordingly, we address the merits of the petitioner's claim that his guilty pleas were involuntary due to his medicated state.

[15] The transcript concerning the canvass of the petitioner reads as follows:

"The Court: Mr. Ramos, I'm going to ask you some questions; if you don't understand at any time you are to ask Attorney Goodrow, and we will take as much time as necessary for you to fully understand what it is that you are doing here today. Because if I accept these guilty pleas, you are going to be bound by them, you are not going to be permitted to withdraw them. So, it is very important that you fully understand the rights that you are giving up and what it is that you are doing here today. So, don't hesitate to utilize the benefit of your attorney at any time that you need it. . . . So, you have now pled guilty, according to my notes, of five felony offenses; is that correct?

"[The Petitioner]: Yes, Your Honor.

"The Court: Have you had sufficient time to discuss each of the guilty pleas to these five felony offenses with your lawyer?

"[The Petitioner]: Yes, Your Honor.

"The Court: And are you completely satisfied with the advice and assistance that Attorney Goodrow has given to you?

"[The Petitioner]: Yes, Your Honor. . . .

"The Court: Are these pleas voluntary?

"[The Petitioner]: Yes, Your Honor.

"The Court: Is anyone forcing you to plead guilty?

"[The Petitioner]: No, Your Honor. . . .

"The Court: Are you under the influence of alcohol and/or drugs today?

"[The Petitioner]: No, Your Honor.

"The Court: Are you taking any medications whatsoever?

"[The Petitioner]: No, Your Honor. . . .

"The Court: I just want to be sure; you seem to have a mark under your eye there . . . is that some kind of black eye or something?

"[The Petitioner]: Yes, Your Honor.

"The Court: All right, in any way does that injury affect your ability to either understand what it is that I am asking you or you giving me answers to the questions that I have asked you?

"[The Petitioner]: No, Your Honor. . . .

"The Court: Mr. Ramos, do you have any questions of your lawyer or me with respect to this plea negotiated disposition?

"[The Petitioner]: No, Your Honor.

"The Court: Do you want the court to accept it?

"[The Petitioner]: Yes, Your Honor.

"The Court: Do either counsel know of any reason why the court should not accept this plea negotiated disposition?

"[The Prosecutor]: I know of none, Your Honor.

"[The Petitioner's Counsel]: No, Your Honor."

[16] During his statement of allocution, the petitioner stated, "I want to apologize to the family of the victim that I assaulted. I'm truly sorry. I wish I could do something better to bring him back or something, but due to my drug addiction led to this craziness action. I truly sorry about this."

———————————————