WILTON CARRAWAY *v.* COMMISSIONER
OF CORRECTION
(AC 33963)

Beach, Bear and Sheldon, Js.

Argued April 18—officially released July 30, 2013

*Dante R. Gallucci*, assigned counsel, for the appellant (petitioner).

*Sarah Hanna*, assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attorney, and *Jo Anne Sulik*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

BEACH, J. The petitioner, Wilton Carraway, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus.[1] On appeal, the petitioner claims that the court erred by rejecting his claims that his trial counsel had rendered ineffective assistance by failing to investigate adequately the extent of the victim's injuries, as documented in his medical records, and to engage an expert witness who could have testified that these injuries might have been caused by something other than a dangerous instrument. These alleged deficiencies, according to the petitioner, rendered involuntary and unintelligent his decision to enter a plea of nolo contendere to one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[2] Because the

---

[1] The habeas court granted the petition for certification to appeal from the judgment denying the amended petition for a writ of habeas corpus.

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

habeas court applied an incorrect legal standard in assessing the petitioner's claims, we reverse the judgment of the court and remand the case for further proceedings consistent with this opinion.

The following facts and procedural history are relevant to the petitioner's claims on appeal. During the early morning hours of September 21, 2006, the petitioner discovered his former girlfriend, Jessica Balisciano, with Brendan Connolly in the backseat of Connolly's car, in a parking lot behind Quinn's Tavern in Southington.[3] Accordingly to Connolly, the petitioner opened the car door without warning and struck him on the side of the head with a blunt object that resembled a tire iron. The petitioner pulled Connolly out of the car and struck him again in the nose. The petitioner proceeded forcibly to remove Balisciano from the car. The petitioner dragged her to her green Ford Mustang, which was parked in an adjacent spot, forced her into the passenger seat and drove to the Flamingo Motel in Meriden, where he checked in under an alias.

Despite his injuries, Connolly was able to drive his own car home. Family members took him to Bradley Memorial Hospital. Computed tomography (CT) scans showed that Connolly had sustained a skull fracture and an epidural hematoma. An X ray revealed a broken nose. He told doctors that his injuries were caused by blows from a crowbar or a similar metal object. A few hours later, Connolly was taken by ambulance to New Britain General Hospital, where he was admitted to the intensive care unit. After a period of observation and additional CT scans, Connolly was discharged at around noon on September 22, 2006. He returned to the hospital on September 25, 2006, for a follow-up CT scan.

---

[3] Although the petitioner and Balisciano had apparently ended their relationship at the time of the assault, the petitioner was still living at Balisciano's home.

Connolly and Balisciano provided sworn statements to the Southington police. Connolly stated that the petitioner had wielded "a steel type object that may have been a tire iron" during the assault in the parking lot. Balisciano's statement corroborated Connolly's account of the attack and also detailed what had transpired after the petitioner had brought her to the Flamingo Motel. She said that the petitioner had called her a "slut" and a "whore" and threatened that she "wasn't going to get out of the motel room alive." In her statement, Balisciano further alleged that the petitioner eventually cleaned up her face and they left the hotel, stopped at the home of a friend of the petitioner's to switch vehicles, and returned to Balisciano's home in Meriden. She sought medical treatment later that day at MidState Medical Center and was diagnosed with a concussion.

The petitioner was arrested and charged with one count each of assault in the first degree, assault in the third degree, kidnapping in the first degree, and unlawful restraint in the first degree, and two counts of breach of the peace in the second degree. He initially retained attorney Paul Carty to defend him, but fired Carty after they "couldn't agree [on] things." On the recommendation of a friend, the petitioner hired attorney William J. Watson. According to the petitioner, he was adamant from the outset of the case that he wanted to go to trial. He wanted to present his side of the story, which was, essentially, that he had engaged in a fist fight with Connolly to defend Balisciano, and that he had not struck Connolly with a crowbar or tire iron. At that point, the state was offering a twenty-year prison sentence, execution suspended after ten years, if the petitioner would plead guilty to assault in the first degree in violation of § 53a-59 (a) (1).

Watson hired a private investigator to determine whether Balisciano would be a cooperative and credible

witness for the state. He determined that, based on e-mails and text messages that she had sent to the petitioner, her credibility as a witness could be undermined. At a pretrial conference, Watson presented his findings to the court, *Alexander, J.*, who decided, in light of Balisciano's potentially diminished credibility, that the court would impose a sentence of fifteen years incarceration, execution suspended after seven years, with five years of probation, in return for the guilty plea.

Watson communicated the details of this new offer to the petitioner in a letter and in a meeting at his office. Watson's letter explained that at a court hearing on March 11, 2008, the "accept or reject date," the petitioner would need to decide whether to accept the offer. If he rejected it, Watson informed him that the case would be placed on the trial list and that all offers would be withdrawn. Watson also outlined all of the other charges in the state's information, and the potential term of incarceration associated with each. According to Watson's calculations, the petitioner faced a maximum sentence of sixty-one years of incarceration if convicted on all charges. The petitioner decided to reject the offer and to proceed to trial.

On March 11, 2008, the petitioner appeared in court. After he expressed his intention to reject the offer, the prosecutor stated on the record that if the case went to trial, he would amend the information to charge the petitioner with attempt to commit murder and that he would proceed also on the kidnapping charge related to the petitioner's alleged abduction of Balisciano. The prosecutor told the court that he believed that Balisciano's sworn statement to the Southington police "would still hold sway with the jury" despite her subsequent sympathetic communications with the petitioner. Watson asked the court if he could discuss the matter with the petitioner during the lunch recess, before the pending offer was rejected irretrievably. When Watson

and the petitioner returned, the petitioner agreed to enter a plea of nolo contendere to the charge of assault in the first degree.

During the plea canvass, the court reviewed with the petitioner the elements of § 53a-59 (a) (1) that the state would have been required to prove beyond a reasonable doubt if he had chosen to exercise his right to a trial. The court specifically explained: "A dangerous instrument means any instrument which under the circumstances in which it is used is capable of causing serious physical injury. . . . [S]erious physical injury means physical injury which creates a substantial risk of death or serious impairment of health or the loss or impairment of any function of a bodily organ." The court further stated that the allegations with respect to Connolly's injuries were that he had "lost consciousness, had bleeding in the brain and had a fracture, all of which [constitute] serious physical injury." The court asked the petitioner if he understood the elements of the crime to which he was entering a plea; the petitioner indicated that he did. Before the plea canvass concluded, the prosecutor informed the court that he was not sure if Connolly actually had lost consciousness, although he was certain that Connolly had sustained a fractured skull and bleeding on the brain. The plea was accepted by the court, and the case was continued for sentencing.

Prior to the sentencing hearing, the petitioner filed a motion to withdraw his plea, pursuant to Practice Book § 39-27, on the ground that his plea had been rendered involuntary by Watson's ineffective assistance.[4] That motion was denied by the court. The petitioner thereafter commenced the habeas corpus proceeding that is the subject of this appeal. The gravamen of the amended habeas petition is that Watson

---

[4] Watson did not represent the petitioner with respect to the motion to withdraw.

"failed to provide sufficient information to enable the petitioner to make an informed decision about whether to plead nolo contendere or proceed to trial."[5] Specifically, he argued that his plea was not entered knowingly, intelligently and voluntarily because Watson failed to ascertain the actual severity of Connolly's injuries and to engage an expert who could have testified that the nature of Connolly's injuries was not inconsistent with the petitioner's version of events, i.e., that Connolly's injuries were inflicted not by a dangerous blunt instrument, but by the petitioner's fists.

At the habeas trial, the petitioner testified that he had decided whether to accept the plea deal under the erroneous assumption—allegedly advanced by the state and not refuted by Carty and Watson—that Connolly had been in a coma and hospitalized for four days. The petitioner stated that he had asked to see Connolly's medical records before the hearing on the plea offer, but that Watson was unable to locate them. He further averred that he did not know the actual length of Connolly's hospitalization until he reviewed the relevant medical records with his habeas counsel. If he had known that Connolly's injuries were less severe than he had thought, the petitioner testified, he would have insisted on going to trial. The petitioner further stated that he would have pursued this course despite the fact that at trial the state could have pursued additional charges related to the alleged kidnapping and assault of Balisciano.

The petitioner also called as a witness Barbara Levin, a legal nurse consultant and a clinical scholar of the

[5] The amended habeas petition was in two counts: ineffective assistance of counsel and violation of due process. The court dismissed the due process count because it was "entirely duplicative of the ineffective assistance allegations of the first count . . . ." The petitioner does not challenge that ruling on appeal.

orthopedic trauma department at Massachusetts General Hospital in Boston. Levin had reviewed Connolly's medical records from Bradley Memorial Hospital and New Britain General Hospital, photographs of Connolly's injuries and the police report. She testified that, in her opinion, Connolly's injuries were caused by a fist. Levin opined that if Connolly had instead been struck by a crowbar or a bat, his injuries would have been more extensive and his fracture's depression would have been more horizontal or lateral in shape depending on how the blow landed. She also testified that, based on her review of Connolly's medical records, he was never in a coma. Levin stated that a "coding error" on a hospital summary sheet erroneously indicated that Connolly had been treated for "traumatic stupor and coma" on September 25, 2006.

Watson was the sole witness for the respondent, the commissioner of correction. He testified that, with respect to the strength of the state's case against the petitioner, Connolly was consistent in his accusations: "He had indicated that he had been pulled out of the motor vehicle by [the petitioner] and subsequently assaulted with a metal object . . . ."[6] He also stated that, on the basis of his review of the medical records, he felt that Connolly's injuries constituted serious physical injuries as defined by the Penal Code. See General Statutes § 53a-3 (4). Watson further stated that, in his view, a trial would have come down to a credibility contest between Connolly's and the petitioner's versions of what had occurred, and Connolly was, "potentially, a very solid witness." Watson also noted that there was significant downside risk to going to trial because the state had announced its intention to pursue the charges

---

[6] Watson also testified that, in an interview conducted by a private investigator engaged by his predecessor Attorney Carty, the petitioner had admitted to threatening Connolly with a fireplace poker that was later recovered by the police from the petitioner's vehicle.

stemming from the alleged assault and kidnapping of Balisciano. Given all of these considerations, Watson characterized the plea offer accepted by the petitioner as "fair."

The court addressed only the prejudice prong and applied the rule enunciated in *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 151, 662 A.2d 718 (1995), regarding what constitutes prejudice when a criminal defendant chooses to take a plea and to forgo his right to a trial. See id. (holding that "[*Hill* v. *Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985)] requires the petitioner to demonstrate that he would not have pleaded guilty, that he would have insisted on going to trial, *and* that the evidence that had been undiscovered or the defenses he claims should have been introduced were likely to have been successful at trial" [emphasis added]).[7] The court held that, in order to prevail, the petitioner needed to show that, "but for counsel's unprofessional representation, the petitioner would have elected to have a trial rather than plead guilty *and that the outcome was likely to be more successful*." (Emphasis added.)

Applying this standard, the court observed that, even if the state had failed to prove beyond a reasonable doubt that the petitioner had struck Connolly with a dangerous instrument, the petitioner had admitted that he had assaulted Connolly, fracturing his skull and nose and causing a subdural hematoma. Given this concession, the court found that "[t]he petitioner may very well have been convicted of assault [in the first degree] under a different subsection, such as § 53a-59 (a) (3) . . . or assault [in the] second or third degree." The court further noted that any expert medical testimony regarding the cause of Connolly's injuries could have

---

[7] The court did not analyze the performance prong of the petitioner's ineffective assistance of counsel claim.

been rejected by a jury, which also would have heard conflicting testimony from Connolly that he had been struck with a metal object. Finally, the court found that the petitioner's prospect of a better outcome at trial was significantly undermined by the lingering charges stemming from the assault and kidnapping of Balisciano. Those charges, despite Balisciano's apparent reluctance to cooperate with the prosecution, were supported by her sworn statement to the police and hospital records documenting the injuries she sustained. Accordingly, the court ruled that the petitioner's claim failed because he had not demonstrated prejudice, as that concept was defined in *Copas*. This appeal followed.

On appeal, the petitioner does not claim that the habeas court erred by applying the wrong prejudice standard. Instead, he argues that the court erred in its application of the facts to the *Copas* standard.[8] The respondent, however, concedes that in a case pending before our Supreme Court, *Brown* v. *Commissioner of Correction*, Docket No. SC 18859, the respondent has taken the position that the prejudice standard applied by the court here is incorrect. Notwithstanding this concession, the respondent contends that the petitioner's claim fails because he did not demonstrate that "he would have achieved a more favorable outcome had he proceeded to trial." In other words, the respondent is asking this court to apply a standard in this case that he has abandoned elsewhere. In these circumstances, we cannot avoid the question of whether the court

---

[8] In the petitioner's appellate brief, he makes the related claim that if Watson had not performed deficiently, the prosecutor or the court might have suggested a more favorable plea agreement. This issue was not alleged in the operative habeas petition and, accordingly, was not considered by the habeas court. We therefore decline to address it. See *State* v. *Outing*, 298 Conn. 34, 63, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011); *Lopez* v. *Commissioner of Correction*, 119 Conn. App. 606, 612, 988 A.2d 901, cert. denied, 295 Conn. 920, 991 A.2d 565 (2010).

applied the correct prejudice standard. We conclude that it did not.[9]

"[W]hether the court applied the correct legal standard is a question of law subject to plenary review. . . . When an incorrect legal standard is applied, the appropriate remedy is to reverse the judgment of the trial court and to remand the matter for further proceedings." (Citations omitted; internal quotation marks omitted.) *Deroy* v. *Estate of Baron*, 136 Conn. App. 123, 127, 43 A.3d 759 (2012). The controlling authority for evaluating the petitioner's claims was announced by the United States Supreme Court in *Hill* v. *Lockhart*, supra, 474 U.S. 52. "The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." (Internal quotation marks omitted.) Id., 56. "Where . . . a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." (Internal quotation marks omitted.) Id.

As with other ineffective assistance claims, the two part standard articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), applies in cases in which a criminal defendant

[9] Despite our determination that the court applied the incorrect standard for establishing prejudice, we note that it acted in accordance with existing precedent. In addition, although we are ordinarily bound by Supreme Court precedent; see *Hopkins* v. *Commissioner of Correction*, 95 Conn. App. 670, 672, 899 A.2d 632, cert. denied, 279 Conn. 911, 902 A.2d 1071 (2006); in light of the respondent's concession, the clear language of *Hill* v. *Lockhart*, supra, 474 U.S. 52, and the analysis of this issue by various Circuit Courts of Appeals, we feel obligated to follow the United States Supreme Court on this question of federal constitutional law. We also note that our Supreme Court has enunciated the standard set forth in *Hill* in several cases subsequent to *Copas*. See *Washington* v. *Commissioner of Correction*, 287 Conn. 792, 833, 950 A.2d 1220 (2008); *Crawford* v. *Commissioner of Correction*, 285 Conn. 585, 598, 940 A.2d 789 (2008); *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 576, 941 A.2d 248 (2008). Though inconsistent with *Copas*, then, our decision today is consistent with subsequent decisions of our Supreme Court.

claims that he endured ineffective assistance of counsel leading to the acceptance of a plea offer. See *Hill* v. *Lockhart*, supra, 474 U.S. 57. The defendant must show that his counsel's performance was deficient and that, as a result, he suffered prejudice. The performance prong requires an attorney to act reasonably and in accordance with prevailing professional norms. *Strickland* v. *Washington*, supra, 688.

The prejudice inquiry in claims arising from counsel's advice during the plea process differs from the analysis of claims following conviction after trial.[10] See *Hill* v. *Lockhart*, supra, 474 U.S. 58–59; see also *Copas* v. *Commissioner of Correction*, supra, 234 Conn. 156. "[I]n order to satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. In many guilty plea cases, the prejudice inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error prejudiced the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the prejudice inquiry will depend largely on whether the affirmative defense likely

_____

[10] Under *Strickland*, in order to demonstrate prejudice following a conviction after trial, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* v. *Washington*, supra, 466 U.S. 694.

would have succeeded at trial. . . . [T]hese predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the idiosyncrasies of the particular decisionmaker." (Citation omitted; internal quotation marks omitted.) *Hill* v. *Lockhart*, supra, 59–60. "Admittedly, the prejudice [prong] of the *Hill-Strickland* test may pose a difficulty in some cases because it is by no means obvious how a court is to determine the probability that a defendant would have gone to trial. It is clear enough that a defendant must make more than a bare allegation that he would have pleaded differently and gone to trial . . . but it is not clear how much more is required of him." (Citation omitted; internal quotation marks omitted.) *United States* v. *Horne*, 987 F.2d 833, 835–36 (D.C. Cir.), cert. denied, 510 U.S. 852, 114 S. Ct. 153, 126 L. Ed. 2d. 115 (1993).

The prejudice analysis formulated in *Hill* was discussed, at some length, in *Copas* v. *Commissioner of Correction*, supra, 234 Conn. 151. Our Supreme Court summarized *Hill* as follows: "*Hill* requires the petitioner to demonstrate that he would not have pleaded guilty, that he would have insisted on going to trial, and that the evidence that had been undiscovered or the defenses he claims should have been introduced were likely to have been successful at trial." Id. The *Copas* court's explanation of the *Hill* prejudice inquiry—which was applied by the habeas court here—is problematic in two respects. First, it diminishes the necessity of considering the impact of counsel's alleged failures on his or her advice as to the desirability of the plea agreement. See *Hill* v. *Lockhart*, supra, 474 U.S. 58–59 ("the determination whether the error 'prejudiced' the defendant . . . will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea"); *Witherspoon* v. *Purkett*, 210 F.3d 901, 903 (8th Cir. 2000)

("[i]n cases involving claims of failure to investigate, a defendant can establish prejudice by showing that the discovery of evidence would have caused counsel to change his recommendation as to the plea offer"). Second, the Supreme Court held that the dispositive factor in the prejudice analysis is the viability at trial of undiscovered evidence or an unpursued affirmative defense. *Copas* v. *Commissioner of Correction,* supra, 157. The *Copas* court interpreted *Hill* as "[requiring] the petitioner . . . to show that the defense that was not discovered or explained to him during the plea process would have likely resulted in either an acquittal, or a more favorable sentence following a conviction of the charged offense or of a lesser included offense." Id., 163 n.18; cf. id., 168 (*Callahan, J.,* dissenting) ("it is not likely that an extreme emotional disturbance defense would have been successful at trial and, consequently, the petitioner was not prejudiced by his counsel's shortcomings").

The *Hill* court, however, did not hold that the prejudice analysis—i.e., a determination of whether the petitioner would have insisted on going to trial—should be reduced to a comparison between the sentence imposed pursuant to a plea bargain with the likely outcome of a trial.[11] The prospect of an acquittal, or a more favorable sentence after a trial, is clearly relevant in considering whether counsel's advice with respect to a plea offer would have changed had he not performed deficiently; indeed, it may be the single most important consideration. See *Hill* v. *Lockhart,* supra, 474 U.S. 60 (evaluation of whether counsel would have changed plea advice depends in *"large part* on a prediction whether the evidence likely would have changed the outcome

---

[11] Indeed, determining whether a hypothetical trial would have resulted in a lesser sentence for the petitioner will likely entail even more speculation than evaluating how the predicted outcome would have informed the petitioner's and his counsel's decision-making process with respect to the plea.

of a trial" [emphasis added]). Additionally, a petitioner's assertion after he has accepted a plea that he would have insisted on going to trial "suffers from obvious credibility problems and must be evaluated in light of the circumstances the defendant would have faced at the time of his decision." *Hooper* v. *Garraghty*, 845 F.2d 471, 475 (4th Cir.), cert. denied, 488 U.S. 843, 109 S. Ct. 117, 102 L. Ed. 2d 91 (1988). In evaluating the credibility of such an assertion, the strength of the state's case is often "the best evidence of whether a defendant in fact would have changed his plea and insisted on going to trial," in light of newly discovered evidence or a defense strategy that was not previously contemplated. *Miller* v. *Champion*, 262 F.3d 1066, 1072 (10th Cir. 2001), cert. denied, 534 U.S. 1140, 122 S. Ct. 1092, 151 L. Ed. 2d 990 (2002).[12]

Notwithstanding the relevance of the projected outcome at a trial that included undiscovered evidence or an overlooked defense, such a prediction is not dispositive in resolving an ineffective assistance claim of this kind. If it were, there would be no need to consider whether *the defendant* would have insisted on a trial; see *Hill* v. *Lockhart*, supra, 474 U.S. 59; it would be enough for a court to compare the terms of the plea agreement with the outcome of a theoretical trial in which the defendant had competent counsel. Instead, the likelihood of an acquittal or a shorter sentence is a factor to be considered in assessing whether an attorney who had found different evidence or considered advancing an affirmative defense would have advised his client to reject a plea offer and go to trial. Likewise,

---

[12] The respondent's position in *Brown* v. *Commissioner of Correction*, Docket No. SC 18859, is consistent with the Tenth Circuit Court of Appeals' statement in *Miller* regarding the relevance of the petitioner's likely prospects at trial. In his appellate brief, the respondent states: "The question of whether the petitioner would have achieved a more favorable outcome at trial is a consideration in examining the credibility of the petitioner's claim that he would have insisted on going to trial."

the credibility of the petitioner's after the fact insistence that he would have gone to trial should be assessed in light of the likely risks that pursuing that course would have entailed. See *Miller* v. *Champion,* supra, 262 F.3d 1074 ("strength of the case that could have been mounted against one pleading guilty to a crime is relevant only because it offers circumstantial evidence of what the petitioner would have done had his counsel not proved to be ineffective"). The bottom line issue that must be resolved is whether, but for counsel's allegedly deficient performance, the petitioner would have insisted on a trial.[13] *Hill* v. *Lockhart,* supra, 59. Analysis of the strength of the state's case and the viability of unadvanced defense strategies informs this analysis, but it is not by itself determinative.

The petitioner's claims are, essentially, that Watson failed to uncover the true extent of Connolly's injuries and to engage an expert who could have furthered the petitioner's "defense" to the charge that he had assaulted Connolly with a dangerous instrument. The petitioner testified that, had he known that Connolly's period of hospitalization was less than he had thought and that Connolly had not in fact been comatose, or that an expert could have supported his version of events, he would have insisted on going to trial. The court evaluated these ineffective assistance claims by considering whether the difference in the severity of Connolly's injuries or the engagement of a medical expert likely would have led to a lesser sentence at trial. The court did not make any findings with respect to whether Watson would have changed his plea advice if he had been cognizant of the actual extent of Connolly's injuries or if he had considered the desirability of utilizing an expert

---

[13] In many situations, the analysis appropriately should consider whether, with the information or analysis that should have informed counsel's advice, counsel would have changed his or her advice, and, if so, with what degree of urgency.

witness to bolster the petitioner's slightly less culpable narrative of the assault. The court also did not consider, at least explicitly, how the petitioner's prospects at a trial that included the introduction of this evidence reflected on the credibility of his testimony that, but for Watson's allegedly deficient performance, he would have rejected the plea offer of seven years incarceration. Of course, many of the court's findings—e.g., that the petitioner had admitted to at least some degree of assault, that the prosecutor had stated his intention to proceed on the charges related to the assault and kidnapping of Balisciano, and that a jury would not be required to accept the conclusions of a medical expert regarding what caused the fracture of Connolly's skull—will be relevant in evaluating both the credibility of the petitioner's testimony and whether Watson's advice to accept the plea would have changed had he performed differently. The fundamental question, of course, is whether the petitioner would not have pleaded guilty.

The judgment is reversed and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.